UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| C.H., et. al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:09-cv-1574- SEB-JMS |
| | ) | |
| JAMES W. PAYNE, | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| THE INDIANA ASSOCIATION OF | ) | |
| RESIDENTIAL CHILD CARE AGENCIES, | ) | |
| INC. d/b/a IARCCA, an Association of | ) | |
| Children and Family Services ("IARCCA"), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | *Formerly, 1:09-cv-1580 WTL-DML* |
| | ) | *(Consolidated with 1:09-cv-1574 for* |
| INDIANA DEPARTMENT OF CHILD | ) | *pretrial purposes only)* |
| SERVICES and HON. JAMES PAYNE, | ) | |
| DIRECTOR in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY GRANTING A PRELIMINARY INJUNCTION**

This matter is before the Court on Plaintiffs' Motions for Preliminary Injunction,

filed pursuant to Federal Rule of Civil Procedure 65.  The cases at bar have been

consolidated for pretrial proceedings.  A hearing was held on January 20, 2010, at which

the parties presented evidence and oral argument.  Having considered the parties'

briefing, the documentary and testimonial evidence, and oral arguments, the Court orally

summarized from the bench at the conclusion of the hearing its conclusions.  For those reasons, as well as the additional reasons detailed below, the Court <u>GRANTS</u> Plaintiffs' motions for injunctive relief.

<b><u>Factual and Procedural Background</u></b>[1]

**A.**      **<u>C.H., et al. v. Payne</u>**

One group of Plaintiffs represents themselves and four classes of litigants consisting of foster parents and foster children directly receiving foster care maintenance payments from the Indiana Department of Child Services ("DCS") and adoptive parents and adopted special needs children directly receiving adoption assistance payments from DCS ("Class Action Plaintiffs").  Title IV-E of the Social Security Act, 42 U.S.C. § 670, *et seq.* ("Title IV-E"), provides federal funding for the purposes of foster care and adoption assistance to states which have submitted state plans to the federal government and have had them approved.  The State of Indiana has submitted such a plan which has been approved and, thus, has agreed to be bound by all of the federal requirements under Title IV-E.  DCS, headed by Director James Payne, is the state agency which administers the Title IV-E monies provided by the federal government.

---

[1] Although these cases have been consolidated for pretrial proceedings, the facts pertaining to each case, while similar, embody many important differences.  Accordingly, we summarize the facts of each case separately.

Under Title IV-E, the federal government underwrites a set percentage of the

State's expenses which are allowable and reimbursable under federal law.[2]  The funds

used to provide the non-federal share of the Title IV-E expenses come from state-

appropriated funds.  Prior to January 1, 2009, county tax levies and funds were used for

this purpose.  However, effective January 1, 2009, Indiana's law changed, so that now

only state money is used to match the federal IV-E funds.

Foster care maintenance payments are funds paid directly by DCS to DCS-licensed

foster parents (among other persons and entities), who are caring for or supervising

children who have been removed from the homes of their relatives and are wards of DCS.

If a child is eligible to receive foster care maintenance payments,[3] the State is required to

pay an amount sufficient to "cover the cost of (and the cost of providing) food, clothing,

shelter, daily supervision, school supplies, a child's personal incidentals, liability

insurance with respect to a child, reasonable travel to the child's home for visitation, and

reasonable travel for the child to remain in the school in which the child is enrolled at the

time of placement."  42 U.S.C. § 675(4)(A).  DCS agrees that foster care maintenance

---

[2] The reimbursement rate is set prior to each federal fiscal year by the federal government.  This rate has risen in each of the last three fiscal years, from 62.69% in fiscal year ("FY") 2008, to 64.26% in FY 2009, and 65.93% in FY 2010.  In February 2009, the federal stimulus bill raised the reimbursement rate an additional 6.2% for expenses incurred from October 1, 2008 through December 31, 2010.  Thus, the current reimbursement rate is 72.13%.

[3] To be eligible for foster care maintenance payments, the child, among other requirements, must have met the eligibility requirements for the former Aid to Families with Dependent Children in the month of his or her removal from the home.  See 42 U.S.C. § 672(a)(2).

payments must cover all the reasonable costs of each of the items listed above.  These payments are paid as a per diem each month for the prior month's services.  Therefore, the monthly payment made on January 1, 2010, was for services rendered in December 2009.

Adoption assistance payments paid under Title IV-E are paid to eligible special needs children[4] and include one-time, non-recurring payments for costs such as attorneys' fees for the adoption.  Such assistance also includes continuing monthly payments for the children until they are at least eighteen years of age or are no longer receiving support

---

[4] In Indiana, a "special needs child" is defined as follows:

(1)    The county office of family and children has determined that the child cannot or should not be returned to the home of the child's parent or parents and that the parent or parents have signed or will sign a consent to adoption regarding the child or that parental rights have been or will be terminated by a court in accordance with IC 31-35.

(2)    One (1) of the following conditions exist:
(A)    The child is two (2) years of age or older.
(B)    The child is a member of a sibling group of two (2) or more children of which at least one (1) is two (2) years of age or older and who will be placed with the sibling group in the same home.
(C)    The child has a medical condition or physical, mental, or emotional disability as determined by a physician licensed to practice in Indiana or another state or territory.

(3)    Reasonable but unsuccessful efforts must be made to place the child in an appropriate adoptive home without providing adoption assistance.  Reasonable efforts include, but are not limited to, the following:
(A)    Photo listing the child with the Indiana adoption resource exchange for a minimum of six (6) months.
(B)    Inability to recruit appropriate, interested adoptive parent or parents who are able to meet the child's needs without the use of adoption assistance.

465 Ind. Admin. Code 2-7-2.

from the adoptive parents.  The statute provides that the amount of the adoption assistance payments "shall be determined through agreement between the adoptive parents and the State . . . which shall take into consideration the circumstances of the adopting parents and the needs of the child being adopted, and may be readjusted periodically, with the concurrence of the adopting parents (which may be specified in the adoption assistance agreement), depending upon changes in such circumstances."  42 U.S.C. § 673(a)(3).  Under federal law, adoption assistance payments cannot exceed the foster care maintenance payment which would have been paid had the adopted child been in foster care.  Id.  As with foster care maintenance payments, adoption assistance payments are paid prospectively (i.e., the January 1, 2010 payment was for the month of December 2009).

    The federal government does not direct the specific amounts of the payments; each state determines the amounts of its own payments.  From 2006 until the payment incurred for services beginning January 1, 2010, the standard per diem for foster care maintenance payments for children not requiring special needs or therapeutic foster care was $25 per day.  However, on January 1, 2009, when the State of Indiana assumed responsibility for the rates, DCS undertook to reexamine the rate structure and determined that the rates needed retooling.  In an attempt to arrive at a reasonable rate for payment, DCS engaged in a benchmarking process which included a comparison of Indiana payments to other states' rates.

As part of this review, DCS also relied heavily on a 2008 report from the United States Department of Agriculture entitled "Expenditures on Children by Families" ("USDA Report"), which contains data on the actual expenditures made by all categories of parents for various categories of items for their children.  In that report, the data is separated by age of child, income level of the family, size of the family, and general geographic area.  The USDA report is not specifically focused on foster children, and, thus, includes certain expenses that are not part of the foster care rate, such as mortgage, rent, health care, and various education costs, but also excludes some expenses which are particular to the care of children in foster care, including traveling costs incurred for visits to the foster child's biological family.[5]  As part of its process of rate determination, DCS began with the amount of the total expenditures listed in the report for children aged fifteen to seventeen who were living in the lowest income group in the geographical region titled "the Urban Midwest" and deducted from that amount expenditures deemed to be non-reimbursable under Title IV-E, such as health care, education, and child care expenditures.[6]  Using that amount, DCS divided by a factor of 365 (days in a year) to reach a per diem of $20.68.[7]

---

[5] Evidence was adduced to establish that the cost of providing necessary essentials for a foster child was, on average, significantly higher than the costs associated with raising children not in foster care, due to the fact that many children in foster care suffer from emotional, behavioral, or developmental problems.

[6] Although DCS removed education and child care expenditures from its calculation, some expenses within those categories are in fact reimbursable under Title IV-E.

[7] The USDA Report indicated that in families with only one child the expense figure
(continued...)

DCS also examined a 2006 nationwide report concerning foster care per diem rates entitled "Hitting the M.A.R.C. – Establishing Foster Care Minimum Adequate Rates for Children" ("the M.A.R.C. Report").  This report sets M.A.R.C.'s, or "minimum adequate rates for children" for three age-groups of children for each state.  Although the M.A.R.C. Report focuses on foster children, it does not include the costs of transporting such children for visits with family or the costs of childcare for working parents, some of which are reimbursable expenses under Title IV-E.  The 2006 figures disclose that Indiana's foster care reimbursement rate was among the highest in the country per the M.A.R.C. Report.  At that same time Indiana's rates were above the M.A.R.C. for two- and nine-year-old children, but below the M.A.R.C. for the sixteen-year-old group.

Based on its analysis of these reports, DCS concluded that Indiana's foster care maintenance payments needed to be reduced, and in late fall of 2009 DCS announced an across-the-board ten percent (10%) reduction in those payments, which reduced the per diem rate from $25 to $22.50.  This is the amount scheduled to be paid beginning February 1, 2010, for foster care maintenance services rendered in January 2010.[8]  This figure, while above the amount reached using calculations based on the USDA Report, is below the 2006 M.A.R.C., both with regard to the nine- and sixteen-year-old age groups.

_____

(...continued)
should be multiplied by a factor of 1.25 to reflect a more reasonable amount.

[8] At some point before DCS instituted the ten percent reduction in foster care maintenance payments, the State Budget Agency had requested that DCS set aside a reserve of another ten percent of its funds for reversion back to the State.

However, according to Douglas Weinberg, Deputy Director and Chief Financial Officer of DCS, even after the ten percent reduction, Indiana's payments still rank as the fifth-highest of all the states in the country.  Prior to reaching its decision to impose this cut, DCS made no attempt to contact foster care parents who were receiving such payments to inquire as to the impact of any reductions in the current per diem rate or to otherwise solicit public comment or input.

With regard to adoption assistance payments, as with foster care maintenance payments, the federal government does not impose any requirements on states as to the exact amount of the payments to recipients, but provides only that those payments not exceed the foster care per diem if the child were in foster care.  Thus, in Indiana, the 2009 adoption assistance per diem was set at seventy-five percent (75%) of the $25 per day foster care rate, that is, $18.50.  Defendants contend that duly promulgated Indiana regulations require that the adoption assistance payments not exceed seventy-five percent of the per diem rate for foster care maintenance payments.[9]  See 465 Ind. Admin. Code 2-7-3.  Thus, in reducing the amount of the adoption assistance rates to correlate with the reductions in the reduced foster care maintenance rates, DCS set the 2010 adoption assistance per diem at seventy-five percent of the reduced foster care rate of $22.50, that is, $16.88.  Again, at no point during the process of rate readjustment did DCS confer

---

[9] Plaintiffs contend that the State may, and does, pay above that percentage while still obtaining Title IV-E reimbursement for its expenditures, provided that the adoption assistance per diem does not exceed the foster care rate as provided by federal law.

with the adopting parents regarding the impact of these reductions on their specific

circumstances and the needs of their adoptive children.

Currently, according to the documentary evidence, there are more special needs

children awaiting adoption than there are prospective adoptive parents, and the reduction

in adoption assistance rates has prompted some possible adoptive parents to decide not to

adopt children.  Affidavit of Carolyn Thurston ¶ 3.  Various Plaintiff class members also

testified that the ten percent reduction in foster care maintenance payments will almost

certainly affect both their ability to cover the costs of the basic necessities for their

children as well as to provide for their more specialized needs.

The total amount of State money saved annually by the 10% reductions in the

foster care maintenance and adoption assistance payments is approximately $10 million.

The major part of these savings comes in adoption assistance payments because more

children are receiving these payments than receive foster care maintenance payments.

**B.**     **The Indiana Association of Residential Child Care Agencies, Inc. v.**
         **The Indiana Department of Child Services**

Plaintiff, the Indiana Association of Residential Child Care Agencies, Inc.

("IARCCA"), is an Indiana non-profit corporation representing approximately 110

agencies.  IARCCA's members provide a variety of services to Indiana families and

children, including residential care and foster care placement services, for which they

receive varying rates of reimbursement from DCS.  Title IV-E provides that, for

institutions such as IARCCA's members, foster care maintenance payments "shall include

the reasonable costs of administration and operation of such institution" as are necessarily required to provide the other items enumerated in § 675(4)(A), including: food, clothing, shelter, daily supervision, etc.

IARCCA's members provide services to two categories of clients that are relevant to this lawsuit: Residential treatment service providers ("Residential Providers"), who provide residential treatment for children in need of various developmental, mental, emotional, and educational services and Licensed Child Placing Agencies ("Placement Providers"), who focus on placement of children into foster care and/or adoptions. Some providers provide both residential and placement services. Children are placed with providers via referrals from DCS, juvenile courts and county probation departments, the Indiana Department of Education and the Indiana Bureau of Developmental Disabilities.

DCS has Residential Treatment Services Provider Contracts ("Residential Contracts") with each Residential Provider which set forth the standards, terms, and conditions applicable to child caring institutions licensed under Indiana statutes and operating under DCS licensing regulations in providing residential care and treatment services to children. The Contracts require Residential Providers to provide basic necessities, such as food and shelter as well as other treatment and services necessary to address the problems of abuse and neglect their children have suffered. Some treatments exceed the DCS per diem rate, but the rate is designed to cover many services and programs beyond the provision of basic necessities.

Licensed Child Placing Agency Contracts ("LCPA Contracts") entered into by the

10

individual Placement Providers and DCS went into effect on January 1, 2010.  Prior to that date, a statewide master contract had not been in effect for Placement Providers.  The LCPA Contracts contain the standards, terms, and conditions applicable to child placing agencies operating under Indiana statutes and pursuant to DCS licensing regulations in providing child welfare services, including placement of children for adoption, foster care, or residential care.  The children served under these contracts do not reside with the Placement Provider; they are placed in foster care and supervised by the Placement Provider.

The Residential Contracts and LCPA Contracts do not specify the rates that DCS will pay for the services described therein nor do they enumerate any criteria on which the rates will be based.  Providers are notified of the rates that DCS will pay when they receive their Individual Child Placement Agreements ("ICP Agreements").  The Providers receive an ICP Agreement tailored to each child under their care or supervision.  These agreements include more individualized information than contained in the master Residential or LCPA Contracts, including information regarding the specific services that each child is to receive.  Because the rates provided by the State for each child differ depending upon the types of services each receives, the Providers are advised of the specific reimbursement rates for the categories of services which they provide only at the time they receive the ICP Agreements.

After DCS assumed responsibility for the rate-setting and payment responsibilities effective January 1, 2009, it assessed the reasonableness and fairness of the rates then

being paid by the State to Residential and Placement Providers.  Mr. Weinberg testified

that, upon review of the rates paid to Residential Providers, DCS discovered that there

existed a significant disparity in payments received among the individual Providers for

what appeared to be similar programs and services.[10]  In order to attempt to better

understand these disparities, in April 2009, DCS Director James Payne sent a letter to

Residential Providers requesting proposed rate-setting information.  DCS requested

detailed program descriptions and budgetary information from the Residential Providers,

but even after a careful review of the information submitted, DCS could not provide a

reasonable rationale for the rate differences.

On the basis of these data, Mr. Weinberg testified that DCS consulted a number of

Residential Providers in an attempt to justify the differences in the proposed rates.

Thereafter, Mr. Weinberg concluded that the overall rate structure needed to be

"compressed" in order to achieve more consistency among the varying amounts of

payments made to Providers for similar services.  He testified that those Residential

Providers who were on the higher end of the rate scale could reasonably be expected to

absorb rate reductions without incurring a significant detrimental impact on the quality of

care they could provide, given that they could also develop other revenue sources (i.e.,

charitable solicitations and fundraising) and improve their inefficiencies in administering

their funding.

---

[10] According to Mr. Weinberg, in certain cases the rates paid to some Providers were five times higher than the rates paid to other Providers for what appeared to be similar programs and services.

In October 2009, DCS informed Residential Providers by letter that the rates they were scheduled to receive in 2010 to cover the same services they provided in 2009 would be decreased by as much as ten percent. However, this reduction would not be imposed uniformly among Providers: Residential Providers on the lower end of the rate spectrum would receive less of a reduction than those Providers on the higher end; some would receive no reductions at all. The reductions ranged from zero to ten percent; thirty-four percent of Residential Providers would receive no reductions and four percent would receive the full ten percent cut. This works out to an average reduction of four percent. DCS's October 2009 letter to Residential Providers contained no detailed explanation of the manner in which any of these rate reductions was calculated. A separate, subsequent letter to Residential Providers informed them that they could request reviews of possible "technical errors" with their respective rates, but again did not explain either how DCS had arrived at the specific rates or how a Provider might know whether a rate was in error, or, for that matter, how to lodge an appeal.

Mr. Weinberg testified that, in October 2009, he had expected DCS to conduct similar reviews in 2010 of the 2011 rates, opining that the rate structures in place when the State assumed responsibility for the payments were so out of kilter that more time than a single year would be necessary to sort everything out. However, based on existing budgetary concerns, the effective dates of the proposed rate reductions were accelerated. On November 30, 2009, therefore, the Residential Providers were sent another letter by DCS informing them that their rates were to be reduced across the board by an additional

13

four percent.  The effect of this reduction was to lower some Providers' rates for certain

services beneath the Title IV-E levels.  The November 30, 2009 letter also stated that the

reduction "**must** be applied to all [ICP Agreements] that are currently in existence for

children that are currently in placement as of the date of this letter and/or [ICP

Agreements] that are entered into between now and January 1, 2010."  Exh. Attached to

Affidavit of Cathleen Graham ("Graham Aff.") at 96 (November 30, 2009 Letter)

(emphasis in original).  DCS further notified Residential Providers of its intent to

terminate their Residential Contracts effective January 4, 2010, "in the event you choose

not to accept such a rate reduction."  Id.  Thus, unless a Residential Provider accepted the

contract containing the rate reduction, no contract would be in place between DCS and

that Residential Provider as of January 4, 2010.

Beginning in mid-summer of 2009, DCS undertook a similar review of the rates

paid to the Placement Providers.  As discussed above, in order to standardize payment

rates for the services provided by Placement Providers throughout the State, a master

contract was created.  The proposed rate information solicited by DCS from Placement

Providers did not contemplate payment for behavioral therapy or counseling services

because those services were not covered under Title IV-E.  Those services accordingly

were unbundled from the proposed rates, but Mr. Weinberg testified that even with their

separation out of the calculations, the average rate proposed by the Placement Providers

was forty percent higher than the 2008 Title IV-E reimbursement rate and, further, as was

true among the Residential Providers, large variations existed among the rates proposed

by the Placement Providers for similar services.

In an effort to address these rate disparities, DCS convened a rate workgroup, which included certain Placement Providers who were members of IARCCA.  According to Mr. Weinberg, rather than adopt a state-wide rate, these representatives of the Placement Providers requested rate compression as a solution.[11]  Thus, in late November or early December 2009, DCS sent letters to all Placement Providers notifying them of rate reductions ranging from zero to twenty percent,[12] with an overall average reduction of eight percent.  According to Mr. Weinberg, approximately twenty-three percent of the programs received no reduction and approximately six percent received the maximum reduction.  DCS also subsequently informed the Placement Providers of an additional across-the-board 6.3% reduction in their contract rates.[13]

This notice of reductions allowed Residential Providers a mere ten days (that is, until December 14, 2009) and Placement Providers a mere sixteen days (that is, until December 20, 2009) to decide whether to sign their individual contracts and thereby

---

[11] Plaintiffs deny that they ever made such a request.  When asked on cross-examination, Mr. Weinberg could not recall the names of any specific individual or individuals who proposed the compression idea.

[12] Because the rates did not increase in 2009, this represents a twenty percent reduction in the Providers' 2008 rates.

[13] This additional reduction was based on DCS's determination that about sixty-three percent of the LCPA contract rate represented the pass through per diem to the foster parent for maintenance payments.  Thus, to reflect the ten percent reduction in the foster parents' per diem rate, DCS reduced the Placement Providers' contract rates the additional 6.3%.

15

accept the reimbursement rate decreases.[14]  Mr. Payne informed the Providers by letter

that, if they did not accept the rate reductions by the designated deadline, DCS would

need to make arrangements to "transition [their] children to other providers."  Exh.

Attached to Graham Aff. at 99 (December 4, 2009 Letter).  In order to avoid the

possibility of having the children whom they serve moved to another location or provider,

but also in an attempt to preserve their rights, many Providers who signed the contracts

attached a "Reservation of Rights" form which provided in part as follows:

> The rates of payment prescribed by this contract are inadequate and violate
> the rights of the undersigned agency and the children placed under the
> agreement as established by federal law.  This agency is signing the
> contract because of the Department of Child Services' explicit statements
> that failing to sign by a deadline 14 days after the contract was tendered
> would result in termination of the agency as a provider and immediate
> relocation of the children in its care, which would be contrary to the best
> interests of those children.  This 14-day deadline is insufficient to allow the
> agency to determine whether it could continue to provide adequate care at
> the reduced rate.  Signing this contract does not waive the agency's right to
> challenge the rates of payment as allowed by law.

Graham Aff. ¶ 22.  On December 15, 2009, DCS informed IARCCA by letter that it

viewed these Reservations of Rights submitted by the Residential Providers to be a "legal

nullity" and repeated that the Residential Providers who had signed their contracts, even

those who had signed with a Reservation of Rights, would be paid according to the

---

[14] We were informed at the hearing that many providers are not-for-profit organizations
who are required by their bylaws to convene their boards of directors before making significant
financial decisions or entering into contracts.  Plaintiffs contend that this accelerated time period
was wholly insufficient to allow them to schedule such meetings, let alone to analyze their
budgets and determine whether they could continue to provide the services they are contractually
obligated to perform with the decreased rates, particularly since the deadline fell during the end-
of-the-year holiday period.  Plaintiffs viewed this timetable as harsh and insensitive to their
interests and those they are seeking to serve.

reduced rates in effect beginning on January 1, 2010.  On December 17, 2009, however, DCS informed Placement Providers that all LCPA Contracts from Providers who had attached the Reservation of Rights to the contract would be rejected, and that, unless the Reservation of Rights was asserted in a separate document, the Contracts would be deemed invalid and DCS would subsequently discontinue future placements with and payments to those Providers.  Id. ¶¶ 23-24.

Five Providers, all members of IARCCA, testified regarding the anticipated effects of the reductions in rates on their organizations.  According to their testimony, because of the cuts many Providers will be forced to reduce staff, which is likely to affect both the children's safety as well as the effectiveness and the adequacy of their therapeutic programs.  Because the majority of children served by Residential and Placement Providers suffer from emotional, behavioral, and developmental problems, there is special need for stable environments, individualized attention, and tailor-made therapies.  In turn, the staff reductions will threaten the continuation of the Providers' professional accreditations.

The rate cuts also threaten to impact Providers' ability to provide individualized therapeutic services such as counseling, vocational programs, and placement of children in homes identified as suitable for meeting their specific needs.  For example, Joe Huecker, Director of Regional Youth Services, a Placement Provider with offices in Jeffersonville, Evansville, and Madison, Indiana, testified that a number of the children served by his organization have been reclassified by DCS from "special needs" foster

17

care (which garners a higher reimbursement rate) to "traditional" foster care (which garners a lower reimbursement rate).  According to Mr. Huecker, a number of the children who were so reclassified unquestionably still require a special needs designation due, for example, to a history of their inflicting sexual abuse on other children.  Such a classification is necessary to ensure placement in a foster home suitable to their needs.  In Mr. Huecker's view, the reclassifications by DCS occurred as simply and foremost another way (indeed, a disingenuous way) to reduce DCS's overall costs.

## **Legal Analysis**

### I.      **Standard of Review**

The grant of injunctive relief is appropriate if the moving party is able to demonstrate: (1) a reasonable likelihood of succeeding on the merits; (2) irreparable harm if preliminary relief is denied; and (3) an inadequate remedy at law.  Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1086 (7th Cir. 2008).  If the moving party fails to demonstrate any one of these three threshold requirements, the emergency relief must be denied.  Id.  However, if these threshold conditions are met, the Court must then assess the balance of harm – the harm to Plaintiffs if the injunction is not issued against the harm to Defendant if it is issued – and, where appropriate, also determine what effect the granting or denying of the injunction would have on nonparties (the public interest).  Id.

In determining whether to grant injunctive relief, the district court must take into

account all four of these factors and then "exercise its discretion 'to arrive at a decision

based on the subjective evaluation of the import of the various factors and a personal,

intuitive sense about the nature of the case." Id. (quoting Lawson Products, Inc. v. Avnet,

Inc., 782 F.2d 1429, 1436 (7th Cir. 1986)).  This process involves engaging in what is

called the "sliding scale" approach, meaning that "the more likely it is the plaintiff will

succeed on the merits, the less balance of irreparable harms need weigh toward its side;

the less likely it is the plaintiff will succeed, the more the balance need weigh towards its

side." Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 12 (7th Cir. 1992).  The

sliding scale approach "is not mathematical in nature, rather 'it is more properly

characterized as subjective and intuitive, one which permits district courts to weigh the

competing considerations and mold appropriate relief.'" Ty, Inc. v. Jones Group, Inc.,

237 F.3d 891, 895-96 (7th Cir. 2001) (quoting Abbott Laboratories, 971 F.2d at 12).


## II.     Discussion

### A.      The Likelihood of Success on the Merits:

#### 1.      Private Cause of Action

Defendants first contend that Plaintiffs do not have a likelihood of succeeding on

the merits of their federal claims because Title IV-E does not create rights enforceable

under 42 U.S.C. § 1983, foreclosing any private right of action.  Plaintiffs do concede that

Title IV-E, by its terms, does not expressly provide a private right of action for alleged

violations of its terms and provisions.  However, Section 1983 "may supply a claim against state actors even when the underlying statute lacks express authorization of private litigation."  McCready v. White, 417 F.3d 700, 703 (7th Cir. 2005) (citations omitted).  Section 1983 provides a remedy for violations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In Gonzaga University v. Doe, 536 U.S. 273 (2002), the Supreme Court made clear that the concept of "rights" differs from "broader or vaguer 'benefits' or 'interests'" created by certain statutes, and nothing "short of an unambiguously conferred right" supports a cause of action brought under § 1983.  Id. at 283.  Thus, "only statutes conferring rights on identifiable persons may be enforced through § 1983."  McCready, 417 F.3d at 703. Plaintiffs must also show that the right is framed in mandatory, rather than precatory terms, and that it is not so "vague and amorphous that its enforcement would strain judicial competence."  Blessing v. Freestone, 520 U.S. 329, 341 (1997).

While the parties do not cite, nor has our research revealed, any Seventh Circuit authority expressly addressing this issue, several courts in other jurisdictions have previously addressed the issue of whether 42 U.S.C. § 672(a)(1) creates rights enforceable by foster parents and foster children under § 1983, and the majority of these courts conclude that such rights are indeed created.  See California Alliance of Child & Family Servs. v. Allenby [Allenby I], 459 F. Supp. 2d 919, 923-26 (N.D. Cal. 2006); Missouri Child Care Ass'n v. Martin, 241 F. Supp. 2d 1032, 1040-41 (W.D. Mo. 2003); Kenny A. v. Perdue, 218 F.R.D. 277, 303 (N.D. Ga. 2003); California State Foster Parent

Ass'n v. Wagner, 2008 WL 191283, at *1 (N.D. Cal. Jan. 22, 2008).  But see Carson v.

Heineman, 240 F.R.D. 456 (D. Neb. 2007).  We agree with what we regard as these well-

reasoned analyses.

       The provision of the statute entitled "Foster Care Maintenance Payments Program"

provides in applicable part that "[e]ach State with a plan approved under this part *shall*

make foster care maintenance payments" with respect to particular foster children defined

therein.  42 U.S.C. § 672 (emphasis added).  "Foster care maintenance payments" are

"payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily

supervision, school supplies, a child's personal incidentals, liability insurance with

respect to a child, and reasonable travel to the child's home for visitation."  42 U.S.C. §

675(4)(A).  For institutional care, "such term shall include the reasonable costs of

administration and operation of such institution as are necessarily required to provide the

items described in the preceding sentence."  Id.

       This language clearly and unambiguously confers a right to receive foster care

maintenance payments to individuals who have foster children who otherwise meet the

eligibility criteria.  The statute explicitly requires any State with an approved plan to

provide payments on behalf of eligible foster children to cover the specific costs listed in

§ 675(4)(A).  In our view, the language contained in § 672(a)(1) is the type of rights-

creating language referenced in Gonzaga.  The right to reimbursement is couched in

mandatory terms (providing that each State with an approved plan "shall" make foster

care maintenance payments) and is neither vague nor amorphous as the statute clearly

enumerates the items and services the payments are required to cover.  Thus, at least for

purposes of ruling on Plaintiffs' request for injunctive relief, we conclude that a cause of

action to enforce of this entitlement by foster parents is available under § 1983.

Moreover, enforcement of this right by IARCCA is also proper because Title IV-E

contemplates payments directly to such providers.  42 U.S.C. § 671(a)(10).

      The statute mandating that adoption assistance payments be made, 42 U.S.C. §

673(a)(3), is also enforceable through § 1983.  The statute provides in relevant part that

the amount of the payments "shall be determined through agreement between the

adoptive parents and the State or local agency administering the program . . . which shall

take into consideration the circumstances of the adopting parents and needs of the child

being adopted. . . ."  Id.  Furthermore, the statute provides that the amount of the payment

may only be readjusted "with the concurrence of the adopting parents."  Id.

      We agree with the analysis incorporated by the Ninth Circuit in ASW v. Oregon,

424 F.3d 970 (9th Cir. 2005), supporting its conclusion as excerpted below that § 671 and

§ 673(a)(3) create rights enforceable by adopting parents and children:

> This language [in § 673(a)(3)] evinces a clear intent to create a federal right.
> The statutory text unambiguously requires the State to engage in an
> individualized process with each family that takes into account their unique
> requirements in determining the amount of their adoption assistance
> payments throughout the duration of their participation in the program. . .
> [T]hese particular statutory provisions are unambiguously framed in terms
> of the specific individual benefitted and contain explicit duty creating
> language.

Id. at 975-76 (internal citations omitted).  Thus, at least for purposes of ruling on Plaintiffs' request for injunctive relief, we conclude that 42 U.S.C. § 673 is enforceable through § 1983.

### 2.    Associational Standing

Defendants also challenge IARCCA's standing to sue in this litigation.  IARCCA does not allege that it directly sustained any injury to itself; rather, it seeks to assert claims for the alleged injuries to its members.  "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).

In deciding this issue, we see that clearly the first prong of this test is met here because, for the reasons detailed in Part II(A)(1), *supra*, where we have determined that individual Providers have standing to challenge the rates that DCS proposes to pay for the services they are providing.  Regarding the second prong, this action to require DCS to comply with state and federal law in setting the reimbursement rates it will pay to Providers is consistent with IARCCA's concurrent, independent interest in establishing and maintaining an appropriately high quality of care for children and their families. Finally, the third prong of the test is satisfied because the relief sought by IARCCA is

injunctive or declaratory, which will inure to the benefit of all of its members who stand

to suffer direct injury by violations of federal law.  See Retired Chicago Police Ass'n v.

City of Chicago, 7 F.3d 584, 602-03 (7th Cir. 1993).  Accordingly, we hold that IARCCA

is a permissible and proper plaintiff in this action, insofar as it seeks injunctive and

declaratory relief on behalf of itself and its members.


### 3.      Class Action Plaintiffs

#### a.      Foster Care Maintenance Payments

Federal law as previously cited provides that foster care maintenance payments

"must cover the cost of (and the cost of providing)" the enumerated items, including food,

clothing, shelter, etc.  42 U.S.C. § 675(4)(A).  DCS does not dispute the clear meaning of

this statutory language, to wit, that the payments provided must cover the total actual cost

of the specified, covered items.  See California Alliance of Child & Family Servs. v.

Allenby [Allenby II], ___ F.3d. ___, 2009 WL 4755730, at *3 (9th Cir. Dec. 14, 2009)

("[B]ecause the [statute] leaves 'cover' unqualified, the common understanding is that it

must refer to meeting all the costs of food, clothing, shelter, etc.").  Moreover, because

Title IV-E requires foster care maintenance payments to fully cover the items specified in

§ 675(4)(A), it follows that the methodology used by the State to determine an

appropriate foster care maintenance per diem must take into consideration the actual costs

of providing the enumerated items.  See Martin, 241 F. Supp. 2d at 1045 ("At a minimum,

the State is obligated to have a process for determining rates that takes into account the

statutory criteria mandated by [the statute]") (citations omitted).  Based on the evidence

adduced at the hearing and in the written documents submitted into the record, we find

that Plaintiffs have established a likelihood of succeeding in their proof that the reduced

rate is insufficient to cover the actual costs of providing the required items or at least that,

in determining the rate for the foster care maintenance payments, the State did not employ

a methodology that fully encompassed Title IV-E's mandatory cost factors.

At the hearing, Mr. Weinberg testified that in setting the rates DCS relied

primarily upon the USDA Report.  However, the appropriateness of DCS's reliance on

that report is questionable because it measures the expenses of raising *all* children, not

only foster children or foster children specifically.  The USDA Report contains certain

expenses that are not reimbursable under Title IV-E and fails to consider other expenses

that are.  Moreover, evidence introduced establishes that, because foster children often

have emotional, behavioral, and/or developmental problems, the costs of providing basic

necessities such as clothing, food, and shelter are often significantly higher for foster

parents.  In addition, the USDA Report's figures represent actual *expenditures* by families

on various items rather than the reasonable *cost* of providing those items.  Further,

because DCS relied on the figures for the lowest income group in its calculations, those

numbers are likely eschewed by the poverty of the recipients rather than reflecting what

the items actually cost in a setting not restricted by such impecunious circumstances.  In

comparison, the M.A.R.C. Report focuses on the Title IV-E expenses specific to foster

care children.  Following the across-the-board ten percent reduction, Indiana's 2010

foster care maintenance payments will fall well below the 2006 M.A.R.C. in two of the three age-group classifications.[15]  Based on this evidence, establishing that the ten percent reduction in payments likely fails to "cover the costs" made mandatory by the statute's requirements, Plaintiffs have established a likelihood of succeeding on the merits on this part of their claim.

Moreover, because Title IV-E requires foster care maintenance payments to fully cover the items specified in § 675(4)(A), while the State is not required to use any particular methodology to determine an appropriate foster care maintenance per diem, it is obligated to use a methodology that takes into consideration the actual costs of providing the enumerated items.  See Martin, 241 F. Supp. 2d at 1045.  The methodology employed by DCS did not satisfy this requirement.  As discussed above, the USDA Report does not focus on the needs of foster care children and does not account for certain expenses that are reimbursable under Title IV-E, such as transportation expenses for visits with biological families, and certain education and child care expenses that DCS deducted from its calculation.  It is true, as Defendants point out, that the 2010 rate reached by DCS ($22.50) is higher than the calculation it reached using only the figures in the 2008 USDA Report ($20.68), ostensibly to cover the costs not contemplated therein.  However, there is no evidence that DCS employed any particular methodology in determining that the

---

[15] The M.A.R.C. in Indiana was calculated in 2006 to be $630 per month for a two-year-old, $722 per month for a nine-year-old, and $791 per month for a sixteen-year-old.  Assuming 30.4 days in a month (365/12), Indiana's 2010 monthly reimbursement rate is $684 ($22.50 x 30.4).

additional $1.82 would be sufficient to fully cover the cost of providing the Title IV-E

items for foster care children in Indiana.  Nor is there evidence that DCS ever consulted

with any of the foster parents affected by the rate reduction to determine whether the

reduced per diem could still be expected to cover the mandatory items.

In addition, to the extent that budgetary concerns drove the decision to impose the

uniform across-the-board ten percent reduction,[16] rather than consideration of the specific

factors mandated by the statute, such a procedure is in our view inappropriate under Title

IV-E.  The Court does not underestimate the pressures on the State to respond to the

myriad of demands to provide services and to do so in a fiscally realistic and responsible

way.  The fact that the task of consolidating such a wide range of data with relatively

limited resources available to draw on and to inform these decisions is a difficult and

challenging one is a matter well understood and fully appreciated by this Court.

However, budgetary concerns cannot excuse reliance on a methodology that does not

encompass the mandatory cost factors set out in Title IV-E.

For the foregoing reasons, we conclude that Plaintiffs will likely be able to show

that, in determining the 2010 rates for foster care maintenance payments, DCS did not

employ a methodology based on the statutory factors mandated in 42 U.S.C. § 675(4)(A),

as required under Title IV-E.  That the reduced per diem is demonstrably insufficient to

cover all of the Title IV-E costs is also the clear conclusion of the evidence adduced by

---

[16] As discussed above, DCS was instructed to reserve 10% of its budget and subsequently cut the foster care maintenance payments by the same percentage.

the parties at this juncture.  Accordingly, we hold that Plaintiffs are likely to succeed on the merits of their claim that the State's ten percent across-the-board reduction in foster care maintenance payments violates Title IV-E.

### b.    Adoption Assistance Payments

The section of Title IV-E governing adoption assistance payments, 42 U.S.C. § 673(a)(3), explicitly requires, in determining the amount of the payments, the State to "take into consideration the circumstances of the adopting parents and the needs of the child being adopted."  In interpreting a State's duty under this section, the United States Department of Health and Human Services has explained that:

> Title IV-E adoption assistance is not based upon a standard schedule of itemized needs and countable income.  Instead, the amount of the adoption assistance payment is determined through the discussion and negotiation process between the adoptive parents and a representative of the State agency based upon the needs of the child and the circumstances of the family.  The payment that is agreed upon should combine with the parents' resources to cover the ordinary and special needs of the child projected over an extended period of time and should cover anticipated needs.

U.S. Dep't of Health and Human Servs., Child Welfare Policy Manual § 8.2D.4, Answer to Question 1, <u>available at</u> http://www.acf.hhs.gov/j2ee/programs/cb/laws_policies/laws/cwpm/policy_dsp.jsp?citID=54 (last visited January 25, 2010).  In our view, Plaintiffs will have little difficulty in establishing that the uniform ten percent reduction made by DCS, reached without *any* consultation with adoptive parents, does not meet that statutory standard.

This statutory requirement clearly requires a State to engage in an individualized determination of the payment amount based on the specific needs of the children being adopted.  See ASW, 424 F.3d at 976 ("[The text of 42 U.S.C. § 673(a)(3)] unambiguously requires the State to engage in an individualized process with each family that takes into account their unique requirements in determining the amount of their adoption assistance payments throughout the duration of their participation in the program.").  It is undisputed that DCS engaged in no such process here, instead simply acting to reduce the adoption assistance payments by ten percent to correspond with the reduction in the foster care maintenance payments.

In light of the clear mandate set out in § 673(a)(3) requiring the State to consider the individual needs of adopting parents and children when setting and readjusting the payments, in our view, the only time an across-the-board cut of adoption assistance payments might be allowable under the statute would be in circumstances where a State's adoption assistance payments exceed its foster care maintenance payments.  See 42 U.S.C. § 673(a)(3) ("[I]n no case may the amount of the adoption assistance payment . . . exceed the foster care maintenance payment which would have been paid during the period if the child with respect to whom the adoption assistance payment is made had been in a foster family home.").  However, there is no indication here that Indiana's adoption assistance rates at any time exceeded those of the foster care maintenance payments, even when compared to the reduced 2010 rate.  After the ten percent reduction (assuming it is determined to be lawful), the 2010 foster care maintenance payment rate

29

would be $22.50.  Because the 2009 adoption assistance rate was $18.75, well below even the reduced foster care rate, we can find no justification for imposing a blanket reduction in the adoption assistance payments for 2010 without (at least) first consulting with adoptive parents and considering the individualized needs of the children being adopted.[17] Because DCS failed to consult or confer with adoptive parents or consider the specific needs of their children before making the rate reduction decision, we find that Plaintiffs have established a clear likelihood of success in establishing that this uniform ten percent cut in adoption assistance payments violates Title IV-E.

### 4.  Provider Plaintiffs

#### a.  Title IV-E

Defendants argue that there is no requirement under Title IV-E that a particular method be used by a State to determine the amount of its foster care maintenance payments, and thus, the method used by DCS to set the Providers rates, while maybe not the method that the Providers wanted, is not violative of Title IV-E.  We agree that Title

---

[17] DCS contends that state regulations require that the adoption assistance payments in Indiana be no more than seventy-five percent of the foster care maintenance payments, and thus, the ten percent cut in adoption assistance payments was required.  The applicable regulatory provision provides: "The amount of the adoption assistance shall not exceed the [foster care] per diem paid by any county department of public welfare in Indiana or seventy-five percent (75%) of the per diem paid by the placing county department of public welfare, whichever is greater." 465 IAC 2-7-3.  However, the county departments no longer perform this task since the State took over child welfare costs, including adoption assistance payments, from counties on January 1, 2009.  Moreover DCS has stipulated that, under certain circumstances, it has made adoption assistance payments in amounts equal to the foster care maintenance payment rate.

IV-E does not mandate that a State use any particular methodology in setting its rates and we are not requiring such here.  However, as discussed in detail above, whichever method the State chooses it must consider the mandatory cost factors enumerated in § 675(4)(A).[18]  See Martin, 241 F. Supp. 2d at 1046 ("This Court is not holding that Defendants need a certain or particular methodology, just that the Defendants need a methodology that considers the required factors.").  The process employed by DCS does not do so.

At a minimum, federal law obligates a State to have a process for determining rates that takes into account Title IV-E's criteria.  Id. at 1042-44.  DCS's 2010 rate-setting procedure was primarily performed by Mr. Weinberg, whose tenure with the agency was less than a year, who had no knowledge of how the rates had been set before 2010, and who did not follow any specific written procedure.  Beyond the letter informing them of the 2010 rates, Providers were given no information to explain or justify the established rates or the criteria on which they were based.  Without a clear rate-setting method, there is no way to discern whether DCS considered the actual cost of the items Title IV-E requires in determining foster care maintenance payments.  Based on Mr. Weinberg's testimony, the process utilized by DCS appears to have focused heavily (perhaps exclusively) on instituting consistency and compression of the Providers' rates, as opposed to determining the actual costs of services.  The rate-setting process also appears

---

[18] Under Title IV-E, Providers are entitled to reimbursement for expenses such as recruitment and training of foster parents, placement of children into foster care, case plan development and management, and certain administrative costs.

to have been almost entirely motivated and controlled by budgetary concerns as is clear from the fact that, less than a month after determining that some Providers merited no decrease in their rates, DCS instituted additional across-the-board reductions applicable to all Providers.  As a result, following the rate reductions, certain Providers are now assigned rates below their Title IV-E claimable rates, even though their contracts with DCS require them to provide more services than the minimum required by Title IV-E. For the reasons detailed above, we hold that IARCAA has a reasonable likelihood of success in showing that the process used by DCS in determining the 2010 rates for Providers did not properly take into account the Title IV-E factors.

### b.      Indiana Code 4-22[19]

As a State agency, DCS is subject to the rule-making provisions of Indiana Code Article 4-22.  Under Indiana law, agency rules must be promulgated according to various statutory procedures, including, *inter alia*: notice (Ind. Code § 4-22-2-23); solicitation of public comment (Ind. Code § 4-22-2-23.1); notice of public hearing (Ind. Code § 4-22-2-24); and public hearing (Ind. Code § 4-22-2-26; 27).  A "rule" is defined as: "an agency statement of general applicability that: (1) has or is designed to have the effect of law; and

---

[19] There is no Eleventh Amendment prohibition to our consideration of this issue because Defendants waived their immunity by removing this case to federal court on December 23, 2009. See Lapides v. Board of Regents of Univ. Sys. of Georgia, 535 U.S. 613, 624 (2002) ("[R]emoval is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter (here of state law) in a federal forum.").

(2) implements, interprets, or prescribes: (A) law or policy; or (B) the organization,

procedure, or practice requirements of an agency."  Ind. Code § 4-22-2-3(b).

Defendants contend that DCS was not required to engage in formal rulemaking on

rates because rate-setting is a contractual matter between DCS and each Provider.

However, we find persuasive the IARCCA's contention that the rate cut directive DCS

instituted was in the nature of a rule, and thus, subject to the statutory requirements

governing rulemaking.  The rulemaking function "embraces an element of generality,

operating upon a class of individuals or situations" and, rather than operating

retrospectively, "the exercise of administrative rulemaking power looks to the future."

Blinzinger v. Americana Healthcare Corp., 466 N.E.2d 1371, 1375 (Ind. Ct. App. 1984)

(citations omitted).  It is true that DCS initially imposed a range of rate reductions that

affected Providers differently based on the services they provided and the amount of their

prior reimbursement rates.  However, DCS subsequently instituted additional cuts of 4%

and 6.3%, which have general applicability to the classes of Residential Providers and

Placement Providers, respectively, and which all Providers were required to accept if they

wanted to continue to contract with DCS.  Such uniform action is a hallmark of rule-

making.  In addition, these rate reductions apply prospectively, not retroactively, and are

applied as though they had the effect of law because Providers who do not accept the

reduced rate may neither contract with DCS nor obtain referrals from the State.  For these

reasons, we conclude that the IARCCA is likely to be able to establish that the general

rate reductions instituted by DCS constitute rules and are thus subject to the provisions of Indiana Code Article 4-22.

It is undisputed that there is no statute or administrative rule in place explicating the procedures used by DCS to set the Residential or LCPA rates.  Even after they received notice of the reduced rates, Providers were given no explanation for the chosen rates or the criteria on which they were based or the way in which an appeal could be lodged.  DCS failed to solicit public comment or to take action to ensure that the rate-setting process was open and transparent and otherwise in compliance with the State of Indiana's statutory requirements.  While the State clearly has both the prerogative and the responsibility to determine overall funding levels, it may not operate within those boundaries in an arbitrary, or apparently arbitrary, fashion.  For these reasons, we find that the IARCCA has a reasonable likelihood of prevailing on its state law claim.

### B.    Irreparable Harm and Inadequate Remedy at Law

The injuries that all categories of plaintiffs stand to suffer if an injunction is not issued are significant and the type for which there is no adequate remedy at law.  There is much more than money at issue in this case.  The evidence presented at the hearing and adduced from the record demonstrates that, absent a preliminary injunction, Plaintiffs are likely to suffer a variety of substantial harms due to the rate cuts, including, *inter alia*: a reduction in the monies necessary for the provision of basic care and support for foster children and special needs adopted children; a reduction in the number of persons willing

34

to be adoptive or foster parents, leading to difficulties placing children in safe and supportive environments; staffing cutbacks, resulting in the loss of necessary supervision and stability for children, many of whom have severe emotional and behavioral problems and require individualized treatment; reclassification of children for financial reasons, resulting in the loss of certain benefits for those children; and the deleterious transfer of children from their current, presumably safe and secure custodial arrangements.

It is the quality of care promised to the children under the applicable statutes that is at stake in the case at bar. Any deficiency in such care cannot later be undone with monetary compensation. See American Commercial Lines, LLC v. Northeast Maritime Institute, Inc., 588 F. Supp. 2d 935, 949 (S.D. Ind. 2008) (Barker, J.) ("[L]egal remedies are inadequate if damages would be inadequate to relieve the wrong.") (citations omitted). Accordingly, we find that Plaintiffs have met their burden to show that, in the absence the preliminary relief they seek, they will likely suffer irreparable harm for which there is no adequate remedy at law.

### C.  Balance of the Harms and the Public Interest

The balance of the harms also weighs in favor of granting a preliminary injunction in the case at bar. We say again that, the current economic climate imposes enormous challenges on the State's ability to deliver on essential governmental services in the face of declining revenues. As the same time, the financial burden that Plaintiffs are faced with if Defendants are not enjoined from implementing the proposed rate reductions is no

less substantial or critical.  The implementation of the proposed funding cuts may be expected to result in immediate reductions in care, housing, services, staffing, supervision, and stability for some of Indiana's most vulnerable citizens – the children who are beneficiaries of the payments at issue.  When compared with the potential emotional upheaval and deprivation of basic necessities that the recipients of the funds are likely to suffer if a preliminary injunction is not granted, the balance of hardships clearly tips in Plaintiffs' favor.  Moreover, the public interest is served by ensuring that the statutes and regulations in place to provide for the safety and well-being of these particularly vulnerable children are strictly followed by the governmental agencies named here as defendants.

### D.    Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides that: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Id.  However, the Seventh Circuit has recognized that, "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)."  Wayne Chem., Inc. v. Columbus Agency Serv. Corp., 567 F.2d 692, 701 (7th Cir. 1977).  In light of the nature of the claims at issue, which concern Plaintiffs' ability to afford to provide basic necessities for their children or the children they serve, coupled with the hardship they would face if a

36

bond were to be required, no bond shall be required to be posed by Plaintiff in this instance.

### III.   Conclusion

For the foregoing reasons, the Court <u>GRANTS</u> Plaintiffs' Motions for Preliminary Injunction.  Defendants, the Indiana Department of Child Services ("DCS") and James W. Payne, Director, and all of their agents, servants, and employees, are hereby <u>PRELIMINARILY RESTRAINED</u> from:

(1)   reducing or otherwise altering any reimbursement rate to any licensed child placing agency ("LCPA") or residential placement provider in the Title IV-E program below the DCS rates being paid on August 1, 2009;

(2)   taking any action to circumvent this order, including but not limited to transferring a child to a less expensive placement, reclassifying a child to a less expensive rate, or declining to assign a child to a more expensive placement, solely or primarily to reduce expenditures on the child; and

(3)   reducing or otherwise altering all foster care maintenance payments paid directly to foster parents and all adoption assistance payments paid to adoptive parents below the amounts being paid on December 31, 2009.  The State is therefore <u>PRELIMINARILY ENJOINED</u> from implementing or otherwise effectuating the planned ten percent reduction in these payments, which was scheduled to go into effect on January 1, 2010, absent further order of this Court.

Said <u>PRELIMINARY INJUNCTION</u> took effect at the conclusion of the hearing on January 20, 2010, by order of the Court and shall remain in effect and extend until further order of the Court or, in any event, no later than a final ruling on the merits.

IT IS SO ORDERED.

Date:   01/26/2010

37

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

David S. Christoff
INDIANA OFFICE OF THE ATTORNEY GENERAL
david.christoff@atg.in.gov

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

James J. Hutton
OFFICE OF THE INDIANA ATTORNEY GENERAL
james.hutton@atg.in.gov

Betsy M. Isenberg
INDIANA OFFICE OF THE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov

Jon  Laramore
BAKER & DANIELS - Indianapolis
jon.laramore@bakerd.com

Anne Kramer Ricchiuto
BAKER & DANIELS - Indianapolis
anne.ricchiuto@bakerd.com

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

April Edwards Sellers
BAKER & DANIELS - Indianapolis
april.sellers@bakerd.com